## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| ALISON FIORINI, | ) |
| | ) Civil Action File No. |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **JURY TRIAL REQUESTED** |
| POINT UNIVERSITY, INC. | ) |
| | ) |
| Defendant. | ) |

## <u>COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF</u>

Plaintiff Alison Fiorini submits the following Complaint for Damages and Equitable Relief against Defendant Point University, Inc., showing the Court as follows:

## <u>INTRODUCTION</u>

1.

This action is brought against Defendant Point University, Inc. ("Defendant" or "Point") by Plaintiff Alison Fiorini, a former female kinesiology graduate student at Auburn University ("Auburn"), who, in the scope of a contractual relationship between Auburn's School of Kinesiology and Point, was offered and accepted a two-year educational opportunity as a certified graduate assistant athletic trainer at Point for its men's football, cheerleading and women's lacrosse teams.

`

2.

Ms. Fiorini seeks damages and equitable relief against Defendant pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688, to remedy Point's deprivation of her legal right to educational opportunities unhindered by sex discrimination after she was first sexually harassed and later sexually assaulted and battered by Toney Robinson ("Mr. Robinson"), a Point graduate student who was also employed as an assistant coach for the men's football team.

3.

Defendant is also liable to Plaintiff under tort causes of action under Georgia law.

4.

From the date that Plaintiff reported her sexual assault and battery to Point within hours of its occurrence on September 27, 2019, until Point dismissed her appeal of its determination that Plaintiff's allegations could not be substantiated on or about September 28, 2020, Defendant knowingly responded with deliberate indifference to the pervasive, severe, and objectively offensive sexual harassment, assault and battery perpetrated by Mr. Robinson against Plaintiff.

`

5.

The sexual harassment, assault, and battery suffered by Plaintiff and Point's subsequent deliberate indifference to the same denied Plaintiff equal access to education programs, activities, and benefits, including, but not limited to, her graduate assistantship at Point and related future career opportunities.

6.

After Plaintiff promptly reported sex discrimination to appropriate officials, Defendant reached erroneous outcomes in Title IX grievance procedures and selectively enforced its code of conduct due to gender bias against women.

7.

From the date that Plaintiff reported her assault to Point on September 27, 2019, until Point dismissed her appeal of its determination that her allegations could not be substantiated on or about September 28, 2020, Point perpetuated an abusively hostile environment created by gender bias against women which materially changed the terms and conditions of Plaintiff's educational experience at Point.

8.

Point's hostile environment created by gender bias against women and deliberate indifference to the pervasive, severe, and objectively offensive sexual harassment, assault and battery perpetrated by Mr. Robinson against Plaintiff, was

`

so obvious that Auburn ultimately ended its contractual relationship with Point on or about December 16, 2019.

9.

As a result, Plaintiff has been deprived of valuable educational opportunities, which has caused significant harm to her intended professional career as a collegiate athletic trainer.

## JURISDICTION AND VENUE

10.

Plaintiff's Title IX claim presents federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

11.

Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because a substantial part of the unlawful actions and practices occurred in this District.

## THE PARTIES

12.

Plaintiff Alison Fiorini is a resident of Lagrange, Troup County, Georgia, and a citizen of the United States. At all relevant times, Plaintiff was a full-time graduate student at Auburn and participated in educational activities at Point as a certified

`

graduate assistant through a contractual arrangement between the two educational institutions.

13.

Plaintiff is a member of a protected class in that she is female.

14.

Defendant Point University, Inc. is a Georgia non-profit corporation with a principal office address of 507 West 10th Street, West Point, Troup County, Georgia, 31833.

15.

Defendant may be served with a summons and copy of the Complaint in this action by delivering a copy of the of Summons and Complaint to its registered agent for service of process, Pat McKee, The Law Office of Patrick W. McKee, LLC, 19 Spring Street, Newnan, Coweta County, Georgia, 30263.

16.

At all relevant times, Defendant was a post-secondary educational institution that receives federal financial assistance as defined by 20 U.S.C. § 1681(c) and therefore subject to Title IX.

`

## FACTUAL BACKGROUND

### 17.

This is a civil rights case brought by Alison Fiorini, a former graduate student at Auburn University who participated in educational activities as a certified graduate assistant athletic trainer for Defendant's men's football, cheerleading and women's lacrosse teams beginning in the fall semester of 2019.

### *Ms. Fiorini's Educational Graduate Assistantship at Point*

### 18.

At the time of the events giving rise to this lawsuit, Auburn's School of Kinesiology (located in Auburn, Alabama) had a contractual relationship with Point (located in West Point, Georgia) whereby Auburn's kinesiology graduates, such as Ms. Fiorini, completed graduate assistantships in Point's athletic department as part of their academic curriculum.[1]

### 19.

Per the terms of its contract with Auburn, Point was expected to, "further the Instructional, Research and Public Service missions of Auburn in a manner consistent with its status as…an educational institution[.]"

---

[1] Although Auburn and Point are located in different states, the distance between the two institutions is approximately 29 miles.

20.

Point, formerly known as Atlanta Christian College, is a private Christian liberal arts university with programs for students to earn associate's, bachelor's, and master's degrees.

21.

Ms. Fiorini began her graduate assistantship as a certified athletic trainer for Point men's football, cheerleading and women's lacrosse teams on or about July 29, 2019.

22.

During a typical day during her graduate assistantship, Ms. Fiorini would attend a kinesiology class at Auburn and then travel to Point. At Point, Ms. Fiorini's supervisor, Head Athletic Trainer Adam Daum, taught her how to implement what she had learned in class and provided her with additional skill training as needed.

23.

In the scope of her graduate assistantship at Point, Ms. Fiorini learned how to use new digital medical record software; how to perform athletic training evaluations with Mr. Daum's supervision and direction; how to improve her communication with other sports professionals; she was taught the usage of modalities; and

`

participated in after-hours seminars and labs with physicians to learn new athletic training techniques.

24.

Each day, Ms. Fiorini was required to report to Mr. Daum what she had learned that day and how she had grown as a certified athletic trainer.

25.

During the beginning of her graduate assistantship at Point, Ms. Fiorini discovered that a previous female Auburn kinesiology graduate assistant at Point left a letter in an information binder for the next female Auburn graduate assistant to warn of sexual harassment from the male football coaches.

26.

Ms. Fiorini was required to complete the graduate assistantship at Point to continue her studies in Auburn's kinesiology program because funds allocated to the graduate assistantship paid her Auburn tuition. Ms. Fiorini was required to remain in good standing in her graduate assistantship and maintain good grades as a condition to graduate from Auburn.

`

### *Ms. Fiorini Is Subjected to Sexual Harassment at Point*

27.

Within the first week of Ms. Fiorini's graduate assistantship, assistant football coach Toney Robinson, who was also a graduate student at Point, began to express a sexual and romantic interest in her.

28.

Mr. Robinson made inappropriate gestures toward Ms. Fiorini, such as purchasing her body wash and hand soap to "take the stress off of her," because he believed she would not have sufficient "down time" after she began her graduate assistantship to purchase personal care items for herself.   Ms. Fiorini did not use the body wash, and it sat on her desk at Point in the office she shared with Adam Daum.

29.

Mr. Robinson repeatedly asked Ms. Fiorini to go on dates and other social outings with him, which she refused. Ms. Fiorini expressly informed him that their relationship needed to be professional.

30.

Despite making it clear to Mr. Robinson that she was not interested in him, Mr. Robinson continued to compliment Ms. Fiorini, telling her she was "beautiful" and "perfect," that she was going to "end up with a black guy" (Mr. Robinson is

`

African American), and that one of the other football coaches thought that he and Ms. Fiorini could be a "match," and should get to know each other, among other comments.

31.

On or about September 3, 2019, Mr. Robinson informed Ms. Fiorini that his ex-girlfriend had accused him of assault, but claimed that Point did not pursue any discipline against him because they found him to be "a stand-up guy."  Ms. Fiorini again told Mr. Robinson that she did not want to date or have a relationship with him.

32.

The following day, Mr. Robinson asked Ms. Fiorini to go to lunch with him, but she declined.  Mr. Robinson stated to Ms. Fiorini, "I definitely don't want you to see me upset…I just don't want you to see me angry…I haven't seen my anger in a long time… ain't no telling what may happen," which Ms. Fiorini regarded as an implicit threat.

33.

Despite his repeated unwanted advances, Ms. Fiorini still attempted to maintain a civil and strictly professional relationship with Mr. Robinson because he

`

was a member of Point's coaching staff and in a relative position of authority over her.

34.

On September 11, 2019, Mr. Robinson informed Ms. Fiorini that he "cried every day they did not talk," and gave her hand lotion.

35.

Ms. Fiorini told Mr. Robinson that it made her uncomfortable that he bought her gifts and that he was being so persistent in pursuing a romantic/sexual relationship with her.  She also offered to pay Mr. Robinson when he bought her a gift, such as personal items or food.

36.

On September 25, 2019, Mr. Robinson sent Ms. Fiorini a text message that read, "love me please."  Ms. Fiorini did not respond.

37.

Each time Mr. Robinson sexually harassed Ms. Fiorini, she reported his conduct to Head Athletic Trainer Adam Daum. On at least one occasion, Mr. Daum responded by asking Ms. Fiorini, "You don't like a persistent man?"

`

38.

Mr. Robinson's sexual harassment of Ms. Fiorini was part of a severe and pervasive culture of sexual harassment of women by the male coaches in Point's athletic department.

39.

For example, on or about September 12, 2019, Assistant Coach George Brewer asked Ms. Fiorini and Point's women's lacrosse coach Bianca Rojas inappropriate sexual questions and discussed going to strip clubs in Atlanta during a social event.

40.

Mr. Brewer also sexually harassed Ms. Rojas around the time that she began her job at Point in 2019.

### *Ms. Fiorini is Sexually Assaulted and Battered*

41.

On the evening of September 26, 2019, Ms. Fiorini went to several bars in Auburn, Alabama with a group of Point's football coaches.  Among those present were Kareen Hawkins, Danny Wheeler, and Mr. Robinson.

`

42.

By the end of the evening, Mr. Wheeler and Mr. Robinson were extremely intoxicated, and boasted about being "professional drunk drivers." Because Ms. Fiorini was concerned about Mr. Wheeler and Mr. Robinson driving drunk, she offered to allow them to sleep on the couches in her apartment, and she would drive them back to their cars the following morning.

43.

Ms. Fiorini, Mr. Hawkins, Mr. Robinson and Mr. Wheeler took an Uber car service, and arrived at Ms. Fiorini's apartment at approximately 2:30 a.m. on September 27, 2019.

44.

Ms. Fiorini provided water to Mr. Robinson and Mr. Wheeler and a place for them to sleep on her sectional-style couch on the first floor of her apartment. Ms. Fiorini and Mr. Hawkins slept in her bedroom on the second floor of her apartment.

45.

Approximately one hour later, Ms. Fiorini was awakened suddenly by a man inserting his fingers into her vagina without her consent.

46.

Ms. Fiorini quickly realized that Mr. Hawkins was sleeping soundly next to her.  She saw that the comforter on her side of the bed had been folded over and the top sheet of her bed was untucked from her mattress to expose her body.

47.

Ms. Fiorini then observed a male figure crawl across the floor in an effort not to be seen, exit the room, and she heard footsteps on the stairs walking downstairs to the first floor of her apartment.

48.

Ms. Fiorini realized she was digitally raped while she slept.  After Ms. Fiorini woke Mr. Hawkins to explain what had occurred, she went to her bathroom and vomited in disgust and shock.

49.

Ms. Fiorini then went downstairs to find Mr. Robinson awake and Mr. Wheeler still sleeping soundly.  It was obvious to Ms. Fiorini that Mr. Robinson had entered her bedroom while she was sleeping and sexually assaulted and battered her.

50.

Ms. Fiorini screamed at the men to leave her apartment, which they did.

`

### *Point Conducted a Sham Investigation into Ms. Fiorini's Allegations of Sexual Assault and Battery in Violation of her Federal Rights*

51.

On September 27, within hours of being sexually assaulted and battered, Ms. Fiorini reported Mr. Robinson's conduct to Point's Head Athletic Trainer Adam Daum, Athletic Director Alan Wilson, and Human Resources Director/Title IX Coordinator Margaret Hodge.

52.

Ms. Fiorini also reported the sexual assault to the Auburn Police Department and received a Sexual Assault Nurse Exam (SANE) at East Alabama Medical Center the same day.

53.

Under the direction of Ms. Hodge, Point initiated an investigation of Ms. Fiorini's claims.  However, Ms. Hodge was not adequately trained regarding how to investigate reports of sexual harassment and violence, or interview victims and potential witnesses of sexual harassment and violence, as required under Title IX.

54.

As a result, Point's sham investigation immediately shifted to investigating whether Ms. Fiorini had "covenant status" within the meaning of Point's Christian standards of conduct applicable to its students; whether Ms. Fiorini had consumed

15

`

alcohol the night of the incident; whether she had engaged in premarital sexual activities; why she had allowed "black men" to sleep in her apartment; and sought to find "inconsistencies" between statements Ms. Fiorini made to different individuals at Point regarding the assault, and as compared to statements she made to the Auburn Police Department as part of its criminal investigation of Mr. Robinson, in a willful effort to discredit her.

### 55.

Mr. Robinson was placed on administrative leave from his coaching job pending the conclusion of Point's investigation. Ms. Fiorini also took a temporary leave of absence from work.

### 56.

On October 28, 2019, Ms. Hodge informed Ms. Fiorini that she had concluded her investigation and determined that Point could not substantiate Ms. Fiorini's allegations. Mr. Robinson would not face any discipline, including termination from his position as an Assistant Coach, or expulsion from Point's graduate program.

### 57.

Ms. Hodge discouraged Ms. Fiorini from appealing her determination because she would "just make the same decision."

`

58.

Ms. Hodge gave Ms. Fiorini the option to work in a different building than Mr. Robinson, but explained that Mr. Robinson would be returning to his coaching duties regardless, which would make contact between Ms. Fiorini and Mr. Robinson inevitable.

59.

Ms. Fiorini made it clear to Ms. Hodge that she did not believe she would be able to continue with her graduate assistantship academic program under circumstances where she was going to have contact with Mr. Robinson.

60.

The following day, October 29, 2019, Ms. Hodge called Ms. Fiorini and admitted that she "did not know how the investigation process worked," and she could not give Ms. Fiorini a full week to make her decision regarding whether she wanted to continue her graduate assistantship educational program.  Instead, she gave Ms. Fiorini until the following day to make her decision.

61.

Ms. Fiorini asked for additional time to decide because it was impossible for her to meet with her graduate assistantship coordinator at Auburn on such short

`

notice to determine if another athletic trainer graduate assistantship placement was possible.

62.

Ms. Hodge then informed Ms. Fiorini that she "forgot" to inform her that if she wanted to continue in the graduate assistantship educational program, it was possible that Mr. Robinson's could be moved to a different building to work, and he would be precluded from working in the fieldhouse with Ms. Fiorini.

63.

Following her conversation with Ms. Hodge, Ms. Fiorini contacted Auburn's Chief Student Development and Retention Officer, Bernard Hill, to make a complaint that she lacked confidence in Point's investigative process due to Ms. Hodge's incompetence.

64.

On October 31, 2019, Mr. Hill interviewed Ms. Fiorini's roommate, Jordan Church, who was present in Ms. Fiorini's apartment the night of the sexual assault and battery and witnessed Ms. Fiorini's trauma immediately thereafter.

65.

Ms. Hodge, who had not interviewed Ms. Church during her "investigation," participated in the interview by telephone. After Ms. Church gave her statement,

`

Ms. Hodge informed Ms. Church that she had only heard "bits and pieces" of her statement because she was in and out of the room due to trick-or-treaters at her home.

66.

On November 1, 2019, Ms. Fiorini informed Mr. Hill that she wanted to continue her graduate assistant educational program at Point.  Mr. Hill passed the information to Ms. Hodge.

67.

On November 5, 2019, Mr. Robinson communicated with Ms. Hodge by email to inquire about the status of her investigation.  Ms. Hodge called Mr. Robinson to inform him that there was no evidence to support Ms. Fiorini's allegations, but she had determined that he had violated Point's student policies regarding the consumption of alcohol.

68.

.    In a letter from Ms. Hodge dated November 13, 2019, Point formalized its finding that evidence to support Ms. Fiorini's allegations against Mr. Robinson was "inconclusive" and "did not substantiate whether [Mr. Robinson] did or did not commit a sexual assault."

`

69.

Ms. Fiorini appealed Point's decision in a letter dated November 14, 2019. Therein, she made Point's Appeal Committee aware that Ms. Hodge had relied on an inaccurate summary of her witness statement and had failed to interview key witnesses in reaching her conclusion.  Ms. Fiorini further explained that Ms. Hodge had informed her that she would have the opportunity to review her witness statement as part of Ms. Hodge's investigation, which did not occur.

70.

Because Ms. Fiorini was never afforded an opportunity to review her witness statement, many facts represented by Ms. Hodge were taken out of context and did not constitute a proper recollection of the events related to the sexual assault and battery.

71.

Ms. Fiorini's appeal further noted numerous factual errors in Ms. Hodge's findings, as well as obvious flaws in Ms. Hodge's bogus investigation.  Ms. Fiorini specifically expressed her belief that Ms. Hodge was not qualified to conduct a Title IX investigation and that her unprofessional and inefficient investigation and overall lack of concern for Ms. Fiorini had yielded an unfair result.

`

72.

Because of the emotional pain and suffering she was experiencing related to the sexual assault and battery and Point's violation of her rights under Title IX, Ms. Fiorini began to utilize academic accommodations to allow her to complete her coursework at Auburn.

73.

On November 19, 2019, Point's Assistant Head Coach George Brewer called Ms. Fiorini and warned her that Point employees were not allowed to talk to her, that she needed to "be smart about how [she went] about things" with Point, and to "let this go" for the sake of her mental state.

74.

On or about November 20, 2019, Ms. Fiorini met with Point's Appeal Committee.  The following day, Mr. Hill began to re-interview all of the witnesses to the sexual assault and battery, including Ms. Fiorini and Mr. Robinson.

75.

Ms. Hodge began to communicate with witnesses in Ms. Fiorini's case, including Mr. Hawkins and Head Coach Julius Dixon for the purpose of pressuring them to sign a written agreement not to have any professional, personal, or social

`

interactions with Ms. Fiorini.  Representatives of Point also took photographs of Ms. Fiorini's car in Mr. Hawkins' driveway.

76.

On December 16, 2019, Auburn terminated its graduate assistantship contract with Point, effective December 31, 2019, because of the sexual assault and battery suffered by Ms. Fiorini while she was participating in educational activities at Point, and Point's failure to take any meaningful action to protect Ms. Fiorini and her civil rights.

77.

At the time that Auburn terminated its contract with Point, employees of Auburn's Violence Prevention & Survivor Advocacy Health Promotion & Wellness Services and Title IX offices were aware that Point had created and published online a Title IX instructional video that included discriminatory statements including, but not limited to, "If you don't want to get raped, don't drink," and "even the tiniest sip" of alcohol could lead to rape, or similar words to convey the same meaning.

78.

On or about July 29, 2020, Mr. Robinson was arrested by the Auburn Police Department on a felony charge of first degree sexual abuse as a result of his sexual

`

assault and battery of Ms. Fiorini.   The criminal case against Mr. Robinson is currently pending in court.

79.

Mr. Robinson was permitted to voluntarily withdraw from Point and resign his employment in or around August 2020.

80.

Ms. Fiorini's appeal of Point's investigation of her allegations against Mr. Robinson was dismissed by Point "without prejudice" on or about August 28, 2020.

### Point Acted with Deliberate Indifference

81.

Point failed to provide training or education to administrators, staff, and students on protecting students from sexual harassment and violence, interviewing victims and potential witnesses of sexual harassment and violence, investigating reports of sexual harassment and violence, remediating sexual harassment and violence, and reporting suspected sexual harassment or violence properly.

82.

Point responded with deliberate indifference to the pervasive, severe, and objectively offensive sexual assault perpetrated by Mr. Robinson against Ms. Fiorini, and instead conducted a bogus and biased investigation into her allegations.

`

83.

At all times relevant hereto, Point failed to provide training or education to administrators, staff, and students on protecting students from sexual harassment and violence, interviewing victims and potential witnesses of sexual harassment and violence, investigating reports of sexual harassment and violence, remediating sexual harassment and violence, and proper reporting of suspected sexual harassment or violence.

84.

Defendant's lack of training is evidenced, *inter alia*, by: subjecting Ms. Fiorini to victim-blaming questioning, including why she allowed "black men" to sleep in her apartment, and ignoring standards applicable to such actions, particularly regarding how victims of sexual violence may react in the midst of trauma; compelling Ms. Fiorini to repeatedly describe the sexual assault, including to persons who, without advising her, sought and used the information to protect Point and Mr. Robinson rather than Ms. Fiorini; failing to adequately inform Ms. Fiorini about her Title IX rights, and acting inappropriately regarding such rights.

85.

Upon information and belief, at all times relevant hereto, Defendant had no Title IX coordinator or other employees at Point designated to handle complaints of

`

sexual harassment and violence who were adequately trained in receiving, coordinating or investigating reports of sexual harassment and violence and discrimination against students or employees.

86.

Upon information and belief, prior to Ms. Fiorini's sexual assault and battery, Point had expelled at least one female student rape victim for "engaging in premarital sex" after she reported a rape.

87.

At all times relevant hereto, Defendant officially adopted sexual harassment policies that were biased against women, inequitable and inadequate with respect to investigating and properly responding to reports of sexual harassment and violence by students or employees and failed to provide training or education on those policies to administrators, employees, and students.

## **COUNT I**
### **Post-Report Deliberate Indifference**
### **in Violation of Title IX, 20 U.S.C. § 1681, *et seq.***

88.

Plaintiff incorporates paragraphs 1 through 87 of her Complaint by reference as if fully stated herein.

`

89.

As of September 27, 2019, Defendant had actual knowledge of Mr. Robinson's sexual harassment, assault, battery, and violence against Ms. Fiorini.

90.

Defendant also had actual knowledge of at least one prior instance of assault by Mr. Robinson perpetrated against another woman prior to Mr. Robinson's sexual harassment, assault, battery, and violence against Ms. Fiorini.

91.

Ms. Fiorini suffered sexual assault, battery, and harassment, as a result of the actions of Mr. Robinson, which is considered sex discrimination prohibited by Title IX.

92.

Defendant knowingly permitted a culture of sexual harassment by male athletic staff toward female graduate assistants by failing to ensure such conduct was prohibited.

93.

Defendant's administrators, employees, and agents with actual knowledge of Ms. Fiorini's report of unlawful sexual conduct had the authority and ability to investigate and take meaningful corrective action to remediate sexual harassment

`

and the hostile educational work environment Ms. Fiorini suffered, including, but not limited to, expelling Mr. Robinson and/or terminating his employment, but failed to do so.

94.

Defendant's failure to take meaningful disciplinary or corrective action against Mr. Robinson and its multiple failures to take any meaningful corrective action to remediate the sexual harassment, violence, and hostile educational work environment that Ms. Fiorini experienced after, and because of, reporting sexual assault, were clearly unreasonable in light of the known circumstances.

95.

Through its actions and inaction, Defendant was deliberately indifferent to the sexual harassment, assault and battery that Ms. Fiorini suffered at Point, and proximately caused severe injuries to Ms. Fiorini.

96.

Through its actions and inaction, Defendant created a climate in which sexual harassment and violence was tolerated, and proximately caused severe injuries to Ms. Fiorini.

`

97.

The sexual harassment, assault, battery, and violence Mr. Robinson inflicted on Ms. Fiorini was severe, pervasive, and objectively offensive, and effectively barred Ms. Fiorini access to educational opportunities and benefits.

98.

The sexual harassment, assault and battery inflicted on Ms. Fiorini, along with Defendant's refusal to take any meaningful action in response to Ms. Fiorini's report of sexual misconduct by Mr. Robinson, effectively barred Ms. Fiorini's access to educational opportunities and benefits.

99.

Because Point was deliberately indifferent to Ms. Fiorini's rights under Title IX evidenced through its willful mishandling of her complaints of sexual harassment, assault and battery by Mr. Robinson, Auburn decided to terminate its contractual relationship with Point for its athletic training graduate assistantship educational program effective December 31, 2019.

100.

Upon information and belief, Auburn recognized that, based on Point mishandling of Ms. Fiorini's Title IX complaint for sexual harassment, assault and

`

battery, it was reasonably foreseeable that the Title IX rights of other female students would be similarly violated if it continued its contractual relationship with Point.

101.

Auburn canceled its graduate assistantship contract with Point as a proximate cause of Point's violations of Title IX related to Ms. Fiorini's allegations of sexual harassment, assault and battery, including, but not limited to, refusing to take any disciplinary action against Mr. Robinson, or ensuring that Ms. Fiorini could continue in her graduate assistantship as a certified athletic trainer with no further contact with Mr. Robinson.

102.

As a result of the cancellation of Auburn's contract with Point halfway through the 2019-2020 academic year, Ms. Fiorini lost the educational opportunity to participate as a graduate assistant athletic trainer at the college level because there were no equivalent positions available to her at another institution at that time.

103.

Ms. Fiorini completed her graduate assistantship required by Auburn's kinesiology curriculum by working as an athletic trainer for nearby LaGrange High School, in LaGrange, Georgia.  This position provided her with far fewer educational

`

opportunities and benefits had she been able to continue her graduate assistantship at the college level at Point, absent violations of Title IX.

104.

By its actions and inaction, Defendant acted with deliberate indifference toward the rights of Ms. Fiorini to a safe and secure educational work environment in violation of the requirements of Title IX, thus materially impairing her ability to pursue a career as a college-level athletic trainer.

105.

Specifically, Defendant violated Title IX by, *inter alia*:

a) Choosing to take sides against Ms. Fiorini, while supporting Mr. Robinson throughout its unprofessional and inefficient investigation of Ms. Fiorini's allegations;

b) Pressuring Ms. Fiorini to "be smart about how [she went] about things" with Point and to "let this go;"

c) Failing to investigate evidence that at least one other Auburn student had experienced sexual harassment while working as a graduate assistant in Point's athletic department;

d) Failing to conduct an unbiased investigation into Ms. Fiorini's reports of Mr. Robinson's sexual misconduct, or being deliberately indifferent thereto;

e) Protecting and advocating for Mr. Robinson, despite Ms. Fiorini's credible and consistent reports of his sexual violence against her;

f) Failing to discipline Mr. Robinson for his acts of sexual harassment, assault and battery against Ms. Fiorini, either by expelling him from enrollment as a student at Point and/or terminating his employment;

g) Creating a climate that tolerated sexual harassment against students, including Ms. Fiorini and others before her, or being deliberately indifferent thereto;

h) Failing to develop or adopt policies and procedures to properly address complaints of employee-against-student sexual harassment, assault, violence, and post-report sexual harassment and bullying;

i) Failing to develop or adopt policies and procedures regarding proper investigation of reports of employee-against-student sexual harassment, assault, and violence;

j) Failing to provide policy, procedures, or training for administrators, employees, and students about sexual harassment and assault;

k) Failing to discipline Defendant's employees and agents identified herein for their willful disregard to Ms. Fiorini's safety and rights;

l) Failing to provide, offer, recommend, or coordinate adequate health, psychological, counseling, and academic assistance and services to Ms. Fiorini after she was sexually harassed, assaulted, battered and violated by Mr. Robinson, or being deliberately indifferent thereto; and

m) Through other actions, inaction, and deliberate indifference.

`

106.

As a direct and proximate result of Defendant's actions, inaction, and deliberate indifference, Ms. Fiorini sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

a)  Past, present, and future physical and psychological pain, suffering and impairment;

b)  Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

c)  Deprivation of an educational opportunity in the form of a college level athletic trainer graduate assistantship, which has led to a diminished professional opportunities and future earning capacity for Ms. Fiorini;

d)  Attorneys' fees and costs; and

e)  Such other and further relief as this Court deems just and proper.

## COUNT II
## Negligent Retention and/or Negligent Supervision

107.   Plaintiff incorporates by reference paragraphs 1 through 87 of the Complaint as if fully restated herein.

108.   During the scope of Plaintiff's employment with Defendant, she was subjected to sexual harassment, assault and battery by Mr. Robinson, an employee of Defendant, as part of severe and pervasive culture of sexual harassment against

`

women by the male football coaches at Point, which was known and tolerated by Defendant.

109.   Mr. Robinson's sexual harassment, assault and battery, created an intimidating, hostile, and offensive working environment for Plaintiff.

110.   Defendant was aware that Mr. Robinson sexually harassed, assaulted and battered Plaintiff, but did not discipline Mr. Robinson for his unlawful conduct.

111.   Defendant failed to take any remedial action toward Mr. Robinson during Plaintiff's graduate assistantship.

112.   Instead, Defendant continued to employ Mr. Robinson when it actually knew, constructively knew, or in the exercise of reasonable care should have known, of his prior history of, reputation for, and propensity for sexual harassment and violence toward women.

113.   Notwithstanding actual and constructive knowledge of Mr. Robinson's prior history of, reputation for, and propensity for sexual harassment and violence toward women, Defendant negligently supervised Mr. Robinson, failed to intercede on Plaintiff's behalf, and negligently retained Mr. Robinson. Thus, it ratified, condoned, and adopted his conduct, making it liable for the negligent supervision and retention of Mr. Robinson.

`

## COUNT III
## Punitive Damages under O.C.G.A. § 51-12-5.1

114.   Plaintiff incorporates by reference paragraphs 1 through 87 of the Complaint as if fully restated herein.

115.   All of Defendant's unlawful conduct set forth herein was intentional, willful, malicious, and conducted with the deliberate intent to harm Plaintiff, or was done with reckless disregard for Plaintiff and her rights.

116.   Accordingly, Defendant is liable to Plaintiff for punitive damages.

## COUNT IV
## Attorneys' Fees and Costs under O.C.G.A. § 13-6-11

117.   Plaintiff incorporates by reference paragraphs 1 through 87 of the Complaint as if fully restated herein.

118.   By its actions described above, and by their stubborn litigiousness prior to and during this lawsuit, Defendant acted in bad faith, was stubbornly litigious, and put Plaintiff to unnecessary trouble and expense.

119.   Thus, under O.C.G.A. § 13-6-11, Plaintiff is entitled to recover her attorneys' fees and expenses incurred in prosecuting this action.

`

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands a TRIAL BY JURY and, as follows:

a. A declaratory judgment that Defendant engaged in unlawful practices in violation of Title IX and Georgia law;

b. An injunction prohibiting Defendant from engaging in unlawful practices in violation of Title IX and Georgia law;

c. An award of pre-judgment and post-judgment interest as required;

d. Compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, diminished professional opportunities and special damages;

e. Punitive damages pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Defendant for its conduct toward Plaintiff and deter Defendant from similar conduct in the future;

f. Reasonable attorneys' fees and costs; and

g. Other and further relief as the Court deems just and proper.

`

Respectfully submitted, this 26th day of September, 2021.

**BUCKLEY BEAL LLP**

*/s/ Rachel Berlin Benjamin*
Rachel Berlin Benjamin
Georgia Bar No. 707419
rberlin@buckleybeal.com
*/s/ Ashley Wilson Clark*
Ashley Wilson Clark
Georgia Bar No. 771512
awilsonclark@buckleybeal.com
600 Peachtree Street NE, Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

*Counsel for Plaintiff*